**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **In re: GUIDANT CORPORATION** | ) | |
| **SHAREHOLDERS DERIVATIVE** | ) | |
| **LITIGATION** | ) | |
| | ) | |
| | ) | **MASTER DERIVATIVE** |
| | ) | **DOCKET** |
| | ) | **NO. 1:03-cv-955-SEB-WTL** |
| | ) | |

**ENTRY DENYING LEAD PLAINTIFF'S APPLICATION FOR**
**INJUNCTIVE RELIEF**

This matter came before the Court on Lead Plaintiff, Alaska Electrical Pension

Fund's ("Plaintiffs") application for: (1) temporary restraining order; (2) order to show

cause why preliminary injunction should not issue; and (3) limited expedited discovery

which was filed on December 19, 2005 ("the Application"). The Court conducted a

telephone conference on December 23, 2005, and, with concurrence of all counsel, stayed

action on the Application pending further developments in this case. On January 4, 2006,

Plaintiffs filed a Request for an expedited hearing and Guidant Corporation *et al.*

("Defendants") responded on January 5, 2006. The court issued an Order to Show Cause

on January 5, 2006, which was responded to by the Plaintiffs on January 9, 2006. A

hearing was scheduled on January 17, 2006, another telephone conference was held on

January 19, 2006 and the court conducted the hearing on the request for injunctive relief

on January 20, 2006. After considering the parties' briefs and filings in support of and in

opposition to the Application, as well as their oral arguments, the Court issued its oral rulings at the conclusion of the January 20th hearing denying injunctive relief.  This entry details the Court's reasoning underlying that decision.

## Issue Summary

Plaintiffs argue that three provisions in Guidant's November 2005 merger agreement with Johnson & Johnson ("J&J"), specifically the Termination Fee, the Indemnification/Insurance Provisions, and the No Shop/No Talk Clause, as well as a separate shareholder rights plan, commonly known as a "poison pill," were enacted in violation of Defendants' fiduciary duties and are distorting Guidant's sales process by impeding other potential acquirers from submitting bids and by driving down the acquisition price.  Plaintiffs contend that Defendants' motive for entering into the November 2005 J&J Merger Agreement was to permit Guidant's Board of Directors ("the Board") to avoid personal liability for misconduct allegedly committed while serving as directors of the corporation through the agreement's insurance and indemnity provisions.

Defendants argue that the Application is barred by Indiana's Dissenters' Rights Statute, IBCL § 23-1-44, and that merger negotiations with J&J and Boston Scientific are fluid and ongoing, making a temporary restraining order premature.  At the time of the hearing, Defendants reported that the Board had determined that a bid by Boston Scientific is superior to the most recent J&J offer.  J&J had through Tuesday, January 24,

2006 to make a counter proposal.[1]

## Facts Summary

On December 15, 2004, J&J and Guidant announced that they had entered into the December 2004 J&J Merger Agreement, which was subject to shareholder approval. Under the terms of that agreement, J&J was to acquire Guidant for $23.9 billion in cash and stock, or $76 per share.  Prior to that announcement, Guidant stock had been trading at $70.59 per share.  The merger agreement contained a termination fee, a non-solicitation clause, and insurance and indemnity provisions.  Also on December 15, 2004, Guidant enacted a shareholder rights plan or "poison pill."  Each of these challenged provisions is discussed in detail below.  On April 27, 2005, Guidant shareholders overwhelmingly voted to approve the December 2004 J&J Merger Agreement.

On November 2, 2005, J&J invoked the "material adverse effect" clause of the agreement arguing that it was not required to close the merger under the previously-negotiated terms based on reports of failures related to certain defibrillator and pacemaker products.  Guidant sued for specific performance of the agreement in an effort to close the deal.

On November 14, 2005, J&J and Guidant entered into a new merger agreement

---

[1] Although we rely on the parties' submissions in this entry, we note that the Indianapolis Star reported on January 25, 2006 that (after the date of our hearing) Guidant entered into a merger agreement with Boston Scientific and has ended talks with J&J. The newspaper further reported that Guidant canceled a previously scheduled January 31, 2006 special meeting for shareholders to vote on the J&J offer.  "Guidant will join Boston Scientific," wrote the Indianapolis Star (Jan. 25, 2006) (available online).

("the November 2005 J&J Merger Agreement"), which revised certain terms of the prior merger agreement.  Under the new agreement, J&J was to acquire Guidant for $21.5 billion in cash and stock, or $63.08 per share   The three challenged provisions were identical to those in the shareholder-approved December 2004 J&J Merger Agreement, except that the termination fee was decreased from $750 million to $625 million, maintaining the roughly three percent ratio to the new purchase price.  The November 2005 J&J Merger Agreement is the agreement at issue in this case and remains subject to shareholder approval.

On December 5, 2005, Boston Scientific announced a competing bid to acquire Guidant priced at $72 per share, and valued at $25 billion.  Two days later, on December 7, 2005, the Board announced that it would enter into discussions with Boston Scientific regarding its recent proposal.  On January 8, 2006, Boston Scientific submitted to Guidant a definitive offer to acquire the company for $25 billion in cash and stock or $72 per share.

In response, J&J revised its offer.  On January 11, 2006, Guidant and J&J announced the terms of an amended agreement under which J&J would acquire the company for $23.2 billion in cash and stock, or $68.06 per share.

Boston Scientific responded in turn the next day, January 12, 2006, improving its offer to acquire Guidant to approximately $73 per share.  Boston Scientific also submitted an Agreement and Plan of Merger.  The agreement contained identical versions of the three provisions challenged by Plaintiffs, except that the termination fee was adjusted to

$730 million.

On January 13, 2006, Guidant and J&J announced their agreement that J&J would acquire Guidant for $24.2 billion in cash and stock, or $71 per share.

Four days later, on January 17, 2005, Boston Scientific announced another revised offer to acquire Guidant for $27.2 billion in cash and stock, or $80 per share - $4 per share more than J&J originally offered in December 2004 and $9 per share more than J&J's current offer (the "January 2006 Boston Scientific Merger Agreement"). Later that day, Guidant's Board announced that it had found Boston Scientific's offer to be the superior proposal. Pursuant to the November 2005 J&J Merger Agreement, Guidant was required to wait five business days (until January 25, 2006) to permit J&J to rejoin before it could change its recommendation of the J&J merger, terminate the J&J merger, or enter into a merger agreement with Boston Scientific. November 2005 J&J Merger Agreement Section 4.02(b). At the time of the Court hearing, the parties were in the waiting period.

## Legal Analysis

### I.    Standard of Review

To obtain preliminary injunctive relief, Plaintiff must show first that it has some (1) likelihood of success on the merits of its claims seeking to excise the three provisions of the J&J merger agreement, and the poison pill and (2) that it has no adequate remedy at law and (3) will suffer irreparable harm if preliminary relief is denied. RWJ Companies, Inc. v. Equilon Enterprises, LLC, 2005 WL 3544295 (S.D. Ind. 2005); Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir.1992). If Plaintiffs can

meet these requirements, the court must then balance the irreparable harm that would be incurred by the opposing party if preliminary relief is erroneously granted against the irreparable harm to the moving party if the relief is erroneously denied.  Finally, the court must consider the public interest, which includes the interests of any persons who are not parties to the case.  Abbott Laboratories, 971 F.2d at 11-12.  The court must then weigh all of those factors in exercising its equitable discretion, "seeking at all times to 'minimize the costs of being mistaken." Id. at 12 (quoting American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593 (7th Cir.1986)).  The approach has been described as a sliding scale approach in which the relative strengths of the parties' positions and the degree of threatened harms are balanced against each other.  Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 811 (7th Cir.2002); Abbott Laboratories, 971 F.2d at 12 & n. 2; Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 387 (7th Cir.1984).

## II.    Likelihood of Success on the Merits

Defendants contend that injunctive relief should not issue because Plaintiffs are unable to make the necessary showing that they are likely to succeed on the merits of their claim that Defendants breached their fiduciary duties by including the three challenged provisions in the merger agreement and by adopting the separate poison pill resolution.  Defendants contend that Plaintiffs' burden cannot be met because their claims are barred by Indiana's Dissenters' Rights Statute and because the challenged provisions are legal and enforceable under Indiana law and, in accepting these provisions, the

6

Defendants did not breach their fiduciary duties.

### A.    Indiana's Dissenters Rights Statute

Section 8(c) of the Dissenters' Rights Statute, IBCL § 23-1-44, provides "A

shareholder . . . [w]ho is entitled to dissent and obtain payment for the shareholder's

shares under this chapter . . . may not challenge the corporate action creating . . . the

shareholder's entitlement."  One corporate action which creates a shareholder's

entitlement to dissent from and obtain payment of the fair value of the shareholder's

shares is the "[c]onsummation of a plan of merger."  IBCL § 23-1-44-8(a)(1).  The

definition of "corporate action" is defined as consummation of "the proposed transaction

itself," as opposed to "the action of the shareholders in approving a proposed

transaction."  Official Comments to Ind. Code § 23-1-44-12.[2]

The Dissenters' Rights Statute limits shareholders aggrieved by a "corporate

action" to a post-"corporate action" appraisal proceeding.  See Ind. Cod § 23-1-44-8.

However, the so-called "Wall Street exception" provides that a dissenting shareholder of

a public company[3] has no right to challenge a corporate action in court or even to seek a

dissenter's appraisal remedy (as provided for in this statute); the shareholder's exclusive

remedy is to sell his or her shares on the open market.  IBCL § 23-1-44-8(b).  The

---

[2] The Indiana Supreme Court "recognize[s]" the Official Comments to the Indiana
Business Corporation Law "as authoritative."  Fleming v. Int'l Pizza Supply Corp., 676 N.E.2d
1051, 1054 n.5 (Ind. 1997).

[3] Meaning a company whose securities are traded on particular national exchanges.

rationale behind this exception is that the public market provides a mechanism whereby a dissenter could seek the "fair value" of its shares.  See Official Comments to IBCL § 23-1-44-8(c).

> **1.     A "Corporate Action" has occurred implicating the Dissenters' Rights Statue.**

Plaintiffs argue that the Dissenters' Rights Statute does not apply to their Application for injunctive relief because no "corporate action" barred from shareholder "challenge" has yet been consummated, and Lead Plaintiff is not a "dissenter" because it has not yet been given an opportunity to, nor has it exercised any "right" to dissent under the statute.  See IBCL § 23-1-44-2.  In response, Defendants contend that the Dissenters' Rights Statute is properly read to preclude a shareholder who objects to a merger from seeking to disrupt, enjoin or otherwise challenge the transaction because Plaintiffs' interpretation of this statute makes no sense in that the Indiana Legislature would not have acted to preclude only dissenters from challenging final "consummation" of a merger, while allowing the greater distraction of interference with ongoing board deliberations and merger negotiations.

Court decisions have interpreted the reach of the Dissenters' Rights Statute broadly.  In Shepard v. Meridian Ins. Group, Inc., 137 F. Supp. 2d 1096, 1099, 1116-17 (S.D. Ind. 2001) ("Shepard I"), Judge Hamilton of our court concluded that Indiana law precludes shareholders from seeking pre-merger injunctive relief.  Judge Hamilton held that "Section 8(c) bars a 'challenge' to the 'corporate action,' without limitation [to]

whether the action has received final, formal approval." Id. at 1106-07. The court rejected an argument that IBCL § 23-1-44-8(c) does not apply "where the transaction has not yet been approved" because "[s]uch potential for disruption exists whether or not the shareholder vote has been taken when the suit is filed or an injunction is issued." Id. at 1106. Further, all shareholders are prohibited from attempting to "enjoin or undo corporate transactions authorized by statute and approved by the majority." Id. at 1107.[4] Accord Bruce Alan Crown Grantors Trust v. Fitzpatrick, Cause No. 71D04-0406-PL–299, slip op. (St. Joseph County Super. Ct. Feb. 3, 2005) (dismissing action to enjoin "merger" relying on Shepard I); Settles v. Leslie, 701 N.E.2d 849, 851-52 (Ind. Ct. App. 1998) (granting summary adjudication on post-merger challenge to price following earlier denial of Temporary Restraining Order to prevent directors "from voting on the planned merger" based on IBCL § 23-1-44-8(c)).

In Young v. Gen. Acceptance Corp., 738 N.E.2d 1079, 1082 (Ind. Ct. App. 2000), plaintiffs filed a shareholder class action challenging a merger based on alleged breaches of fiduciary duties in the merger process and seeking to enjoin the merger. The court denied plaintiffs' request for a preliminary injunction, and thereafter granted defendants' request for summary judgment because plaintiffs had failed to perfect their rights under the Dissenters' Rights Statute.

---

[4] Plaintiffs contend that Shepard I is not on point here because Judge Hamilton denied the plaintiffs' request for "injunctive relief to block consummation of the . . . merger." Id. at 1099. Plaintiffs contend that this holding is based on a misreading of Indiana state law and that we should not feel compelled to follow the conclusions in Shepard I. Ryan v. J.C. Penney Co., 627 F.2d 836, 837-38 (7th Cir. 1980).

In G&N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 242 (Ind. 2001) ("G&N Aircraft II"), aff'g in part and rev'g in part; G&N Aircraft, Inc. v. Boehm, 703 N.E. 2d 665, 670-71 (Ind. Ct. App. 1998) ("G&N Aircraft II"), a minority shareholder sought injunctive relief alleging that his role in the closely-held corporation was being limited and that he was being coerced into selling his shares as part of a "freeze out" merger.  The court found that "preliminary injunctive relief was [] appropriate to prevent further damage to [plaintiff's] interests pending trial."  See G&N Aircraft I, 743 N.E. 2d at 242 (internal citation omitted).  Plaintiffs contend that the holding in G&N Aircraft I and II stand for the proposition that Indiana law provides for the possibility of injunctive relief to enjoin a corporate fiduciary's breach of duties to shareholders in connection with events leading up to a proposed merger.  Id.  However, in G&N Aircraft I and II, the dissenting shareholder did not challenge or seek to interfere with any specific merger or ongoing merger negotiations.  Id. at 243.  The Court in G&N Aircraft I found that IBCL § 23-1-44-8(c) was inapplicable because a merger was not involved, and noted that "dissenters' rights are the exclusive remedy in cases of merger . . . ."  Id.  Likewise, the Court did not enjoin or excise particular provisions of a merger agreement, directing instead a non-public corporation to buy out the minority shareholder's interest.  Id.

Plaintiffs' arguments that the Dissenters' Rights Statute does not apply to Plaintiffs Application for injunctive relief because no "corporate action" barred from shareholder "challenge" has yet occurred and further, that Plaintiff is not a "dissenter" because it has not had the opportunity to exercise any "right" to dissent under the statute are

10

unpersuasive.  First, Plaintiffs' only "right" to dissent under the statute is its right to sell its stock, which can be done at any time; Plaintiffs do not need statutory or judicial permission to do so.  See Ind. Code § 23-1-44-2.  Second, Plaintiffs are, in effect, challenging the consummation of the merger agreement, because obviously without a finalized proposed merger agreement, there can be no consummation of the merger agreement.  The Dissenters' Rights Statute is properly read to preclude a shareholder who objects to a merger from seeking to disrupt, enjoin or otherwise challenge the transaction. We find no logic in the argument that the Indiana Legislature sought only to preclude dissenters from challenging final "consummation" of a merger, while permitting an equally distracting interference with ongoing board deliberations and merger negotiations. Plaintiffs here ask us to do early what cannot be done later, that is, permit their challenge to the consummation of the merger agreement as proposed.  We shall not intervene nor permit Plaintiffs to intervene in this fashion, and, in any event the Plaintiff shareholders are not without protection because, if the merger is consummated, they qualify as dissenters' under the statute, and, if the merger is not consummated, they are not harmed.[5]

### 2.    Are the three challenged provisions collateral or are they essential to the agreement?

Plaintiffs argue that the Dissenters' Rights Statute does not preclude injunctive relief because Plaintiffs' Application does not seek to prevent, enjoin, or undo the

---

[5]  Because the Poison Pill resolution is not a part of the merger agreement, as such, it is not covered by the Dissenters' Rights Statute.  Therefore, we shall address that provision in a more appropriate context below.

November 2005 J&J Merger Agreement, seeking instead only to enjoin three discrete

provisions of the merger agreement in an effort to ensure that the sales process yields a

final result for shareholder consideration which is not corrupted by the effect of these

challenged provisions.[6]  Pl. Resp. to Court at 5.  Defendants claim that this is a distinction

without a difference because, just as Plaintiff cannot interfere with the merger process by

seeking to enjoin the entire merger, neither can Plaintiff secure an injunction piecemeal.

In general, parties are free to contract as they see fit, provided that the contract

does not impose obligations that are contrary to statute, public policy, or an established

rule of the common law.  See Cowper v. Collier, 720 N.E.2d 1250, 1255 (Ind. Ct. App.

1999); Zollman v. Geneva Leasing Associates, Inc., 780 N.E.2d 387, 392 (Ind. App.,

2002).  A valid contract requires consideration.  Family Video Movie Club, Inc. v. Home

Folks, Inc., 827 N.E.2d 582 (Ind. App. 2005).  Courts will not recognize or enforce

contracts resting upon an illegal consideration.  An illegal consideration causes the whole

---

[6] Plaintiffs allege that terms contained in the 2005 Merger Agreement contemplate the type of relief sought by Plaintiffs, specifically § 8.12 (the severability clause) which provides: "If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted . . . ."  Plaintiffs argue that if the Court grants injunctive relief, the J&J Merger can nonetheless go forward.  However, Defendants state, and we agree, that excising these provisions would change the bargain that was struck by and between the negotiating parties, and the parties would then need to renegotiate and perhaps modify other, corresponding terms of the merger agreement. Merger Agreement § 8.12.  Def. Memo in Opp. at 13.

promise to fail, rendering the contract void.  In other words, a contract that rests on illegal

consideration is itself illegal.  AMJUR CONTRACTS § 223.

Of the three provisions at issue here – the no talk/no shop clause, the termination

fee, and the indemnification provisions – the no talk/no shop and the termination fee

provisions provide benefits that were likely part of the consideration to J&J in entering

into the merger agreement; as such, they are essential terms of the parties' agreement.  As

for the indemnification provision, it too was likely part of the consideration, on the part of

Defendants in entering into the Agreement and cannot be judicially excised without

altering the balance of mutual benefits negotiated by the parties.[7]  Plaintiffs' argument

that it does not seek to challenge the consummation of the entire merger, but simply seeks

to have these particular provisions of agreement excised in order to "improve" the

negotiation process, is unconvincing under applicable authorities and is thus unavailing.

For these reasons, we hold that Plaintiffs' challenge to the three provisions in the

merger agreement are barred by the Dissenters Rights Statute.  However, even if the

challenge to these three provisions were not barred, Plaintiffs claims that the provisions

were adopted in violation of the Board of Directors' fiduciary duties are unlikely to

succeed on the merits, for the reasons discussed below.

---

[7]    Defendants argue that Alaska Electrical's claims fail because it has not
joined J&J as an indispensable party, given J&J's indisputable interest in this injunctive
action, relying on Fink v. Cont'l Foundry & Mach. Co., 240 F.2d 369, 375 (7th Cir. 1957)
(shareholders of Continental sued to prevent company from selling assets; after officers
sold assets pending appeal, claims were defective because purchasers were not before the
court).  Because we deny injunctive relief on other grounds, we have not addressed this
alternative theory.

**B.      The challenged provisions are lawful inclusions in a merger agreement and were not adopted in violation of the Board's fiduciary duties.**

In determining whether the Guidant Board breached its fiduciary duties in adopting the three challenged provisions and the poison pill resolution, we first examine the Board of Directors' duty of care, the Business Judgment Rule, the manner in which conflict of interest transactions are to be evaluated, and the role of shareholder ratification.  We address each of these issues below.

**1.      Duty of Care**

"The drafters of the IBCL [Indiana Business Corporations Law] went well beyond the drafters of the RMBCA [Revised Model Business Corporations Act] in reducing the situations where directors can be held liable for improper conduct or for corporate mismanagement."  Galanti, INDIANA PRACTICE, Vol. 18, Ch. 25 at 681.  Directors will not be held liable for negligence; instead, they must fail to comply with a standard of care constituting "willful misconduct or recklessness."  IBCL § 23-1-35-1 (defining a director's duty of care).  Willful misconduct or recklessness requires, at a minimum, a conscious disregard of or indifference to the consequences of a risky act.  Orkin Exterminating Co. v. Traina, 486 N.E.2d 1019, 1023 (Ind. 1986).

Section 23-1-35-1(f) of the IBCL states that "directors are not required . . . to take or decline to take any action under this article, solely because of the effect such action might have on a proposed acquisition of . . . the amounts that might be paid to shareholders under such acquisition."

14

Thus, in the action at bar, Defendants can only be found liable for a breach of fiduciary duty if it is determined that, by adopting the challenged provisions, they consciously disregarded or were indifferent to the consequences of a risky act (to wit, entering into the merger agreement).

### 2.    Business Judgment Rule

The Business Judgment Rule embodies the principle that there should be a judicial reluctance to interfere in corporate matters, and in particular, in the exercise of discretion by the directors in managing corporate affairs.  Thayer v. Kinder, 45 Ind. App. 111 (1909).  The Rule presupposes that directors have acted honestly in compliance with their fiduciary duties and with reasonable care in reaching a corporate decision.  Port v. Russell, 36 Ind. 60 (1871).

Indiana has a "strongly pro-management version" of the Business Judgment Rule, which "invests a board of directors with broad discretion in the management of the corporation in the operation of its business."  G&N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 238 (Ind. 2001).  The Business Judgment Rule provides a primary defense for directors who are charged in a shareholder derivative action with actions allegedly harmful to the corporation.  It imposes a heavy burden on a shareholder claiming corporate mismanagement to show a gross abuse of discretion or an unreasonable exercise of  judgment under the circumstances.  W.Q. O'Neall Co. v. O'Neall, 108 Ind. App. 116 (1940); Cole Real Estate Corp. v. Peoples Bank & Trust Co., 160 Ind. App. 88 (1974); Rubens v. Marion-Washington Realty Corp., 116 Ind. App. 55 (1945).

Defendants claim that the Plaintiffs' objections here are unavailing under the Indiana Business Judgment Rule, IBCL § 23-1-35-1(d).  They note that Plaintiffs' complaint that the challenged provisions do not maximize shareholder value – i.e., they allegedly reduce any merger price – is trumped by the IBCL and the Indiana Business Judgment Rule, which expressly provide that in making corporate decisions directors may give weight to factors other than maximizing shareholder value.  See Murray v. Conseco, Inc., 795 N.E.2d 454, 461 (Ind. 2003) (stating that the IBCL "is extremely deferential to directors' judgment as to what is in the corporation's interest").  IBCL § 23-1-35-1(d) provides:

> A director may, in considering the best interests of a corporation, consider the effects of any action on shareholders, employees, suppliers, and customers of the corporation, and communities in which offices or other facilities of the corporation are located, and any other factors the director considers pertinent.

Similarly, IBCL § 23-1-35-1(g) provides:

> In taking or declining to take any action, or in making or declining to make any recommendation to the shareholders of the corporation with respect to any matter, a board of directors may, in its discretion, consider both the short term and long term best interests of the corporation, taking into account, and weighing as the directors deem appropriate, the effects thereof on the corporation's shareholders and the other corporate constituent groups and interests listed or described in subsection (d), as well as any other factors deemed pertinent by the directors under subsection (d).

The Business Judgment Rule comes into play when the challenged transaction does not include claims of self-dealing or conflict-of-interest; however, when self-dealing or conflict-of-interest claims are asserted, the more demanding "intrinsic fairness" test

(discussed below) is applied.  <u>Sinclair Oil Corp. v. Levien</u>, 280 A.2d 717 (Del. 1971) <u>on remand</u> 300 A.2d 28 (1972).

### 3.      Conflict-of-Interest Transactions

A transaction marred by a conflict-of-interest is defined in the IBCL as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." IBCL § 23-1-35-2.  Courts traditionally place the burden on the interested director to prove the propriety and fairness of a challenged transaction; however, Indiana law reflects the minority rule in such circumstances, imposing the burden on the challenging minority shareholder to establish the unworthiness of the conduct.  <u>Krukemeier v. Krukemeier Mach. & Tool Co.</u>, 551 N.E.2d 885, 888 (Ind. App. 1990) (stating that "the standard of proof in compensation cases requires a plaintiff shareholder to show the compensation is unjust, oppressive, or fraudulent.").  IBCL § 23-1-35-2(a)(3) provides that a conflict-of-interest transaction is nonetheless valid if, <u>inter alia</u>, the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and was authorized, approved, or ratified by them; or if the transaction was fair to the corporation.  <u>Id.</u> at (a)(2) - (a)(3).  "Fairness" means whether under the circumstances an independent corporate fiduciary exercising sound business judgment would bind the corporation to the transaction in an arm's length bargain.

In the case at bar, shareholder ratification will be necessary to give final approval to the proposed merger agreement.  If the shareholders determine that the Board should

not have included the three challenged provisions in the November 2005 J&J Merger Agreement, they presumably will vote down the Agreement.  The fact that the December 2004 J&J Merger Agreement containing similar provisions received the overwhelming approval of Guidant's shareholders does not bode well for such a rejection, however, and Defendants' inclusion of these terms in their subsequent merger proposed agreement suggests its reasonableness under the IBCL.

Therefore, to the extent Plaintiffs claim that the challenged provisions were entered into solely for the benefit of the individual Board Members at the expense of the shareholders, it is incumbent on Plaintiffs to establish that these provisions are not fair, or, stated otherwise, that an independent corporate fiduciary exercising sound business judgment would not bind the corporation to these provisions in an arm's length bargain. Should the shareholders ratify the agreement, all doubts as to the fairness of the questioned transaction would be removed.

## III.    The Challenged Merger Agreement Provisions

The three provisions of the Merger Agreement which Plaintiffs seek to enjoin (the No-Talk/No-Shop Clause (§4.02), the Penalty Clause (§5.06) and the Insurance/Indemnity provisions (§5.05)), according to Plaintiffs, represent illegal actions by Defendants occurring "within the bidding process of a corporate takeover or merger [to] rig, control or stifle . . . bidding to their own advantage." See Stepak v. Schey, 553 N.E. 2d 1072, 1078 (Ohio 1990).  We evaluate each of the four challenged provisions below:

18

### A.    Termination Fee

We have uncovered virtually no controlling case law challenging the legality of termination fees in merger agreements.[8]  Plaintiffs relied on their two experts, Greggory A. Brauer, Ph.D., ("Brauer") (Pl. Exh. 35) and Lucian A. Bebchuk, Ph.D., ("Bebchuk") (Pl. Exh. 36) to establish that a termination fee is in actuality an unenforceable penalty clause, which in this case provided J&J with compensation exceeding any actual damages that would have been incurred if this transaction fell through.[9]  Plaintiffs maintain that Defendants have failed to provide them or the Court with any competent evidence to indicate that the $625 million Termination Fee (accruing, according to Plaintiffs in 11 days) is "proportionate to the expected damages."  See Citicorp, 206 F. Supp. 962, 965 (S.D. Ind. 2002), Pl. Resp. to Court at 14.  Plaintiffs argue that this excessive fee disadvantages the shareholders.  Bebchuk concluded that:

---

[8]  Plaintiffs assert that Defendants have not brought forth any controlling authority to support the inclusion of a termination fee.  Plaintiffs contend that it has "legions of Indiana law firmly rejecting penalty clauses like § 5.06 that bear no reasonable relationship to the damages incurred."  Lead Pl. Response to Court's Jan. 5, 2006 Order at 14.  See, e.g., A.V. Consultants, Inc. v. Barnes, 978 F.2d 996, 1001 (7th Cir. 1992) (applying Indiana law).  However, the authority on which Plaintiffs rely does not involve termination fees in merger agreements and Plaintiffs have not cited any case calling into question a termination fee in a merger between public companies.

[9]  One of the Plaintiffs' experts, Lucian A. Bebchuk, Ph.D., concluded that "inclusion of the Termination Fee in the 2005 Agreement should have been expected to have an adverse effect on the interests of Guidant's shareholders."  Exh. 35 at 1.  Similarly, Plaintiffs' other expert, Greggory A. Brauer, Ph.D., concluded that the termination fee "prevent[s] Guidant stockholders from obtaining the maximum value for their shares in the market for corporate control, either with respect to the transaction contemplated by the Proposed Merger Agreement or with respect to any potential alternative transaction for the Company.  Exh. 35 at 2.

> Termination fees can produce three types of costs.  First, the presence of a termination fee can distort shareholders' decisions whether to approve the merger. . . . Second, the presence of a termination fee might discourage a rival partner from coming forward with a competing offer.  Third, even if a rival partner does come forward, a termination fee will reduce the amount that the rival will be willing to pay. . . .

> Pl. Exh. 35 at 4.

In response, Defendants contended that termination fees are a customary provision in merger agreements, that the termination fee in this case is not excessive and, contrary to Plaintiffs' claims, it actually benefits the shareholders.  Defendants point out that the fee in this merger agreement is approximately three percent of the purchase price ($650 million out of $21.5 billion).  Defendants further argue that the appropriateness and amount of the fee should be assessed in light of J&J's having been the first bidder who actively pursued a merger with Guidant for more than a year.  Lastly, a termination fee (at the same percentage, 3%) was included in the December 2004 J&J Merger Agreement, which was overwhelmingly approved by shareholders in April 2005.

At the court hearing, Defendants' expert, Professor Daniel R. Fischel ("Fischel"), an expert in law and economics, testified that his research discloses that termination fees are common in large merger transactions and are beneficial to the shareholders of targeted firms[10] because they compensate the acquiring firm for its transaction costs, for forgone opportunities to pursue related deals, for the potential of rivals who might free-ride on its costly investigation, and for granting the target an option to act on future information by

---

[10]  The target firm is the company being pursued for purchase, in this case, Guidant.

exiting or remaining in the deal.  Fischel found that acquirers are willing to pay more in transactions, with target termination fees and are more likely to come forward with a bid where they stand to obtain a termination fee.[11]

In deciding whether a termination fee is valid as liquidated damages or invalid as a penalty, Indiana courts have generally relied on the rule that "where the nature of a contract is such that a breach would result in damages which are uncertain and difficult to prove and the parties to the contract have fixed an amount of liquidated damages which is not greatly disproportionate to the loss likely to occur, then that fixed sum will be accepted as liquidated damages and not as a penalty."  Harris v. Primus, 450 N.E.2d 80,

---

[11] Fischel cited the following articles:

"My empirical evidence demonstrates that merger deals with target termination fees involve significantly higher premiums and success rates than deals without such clauses.  Furthermore, only weak support is found for the contention that termination fees deter competing bids.  Overall, the evidence suggests that termination fee use is at least not harmful, and is likely beneficial, to target shareholders."

M. Officer, "Termination Fees in Mergers and Acquisitions," Journal of Financial Economics, Vol. 69, No. 3, September 2003.

"Fee provisions appear to benefit target shareholders through higher deal completion rates and greater negotiated takeover premiums.  We conclude that target-payable fees serve as an efficient contracting device, rather than a means by which to deter competitive bidding."

T. Bates and M. Lemmon, "Breaking Up is Hard to Do?  An Analysis of Termination Fee Provisions and Merger Outcomes," Journal of Financial Economics, Vol. 69, No. 3, September 2003.

83 (Ind. App. 1983).[12]

Interestingly, the requirement of showing the amount of loss likely to occur is typically imposed on the party seeking to collect the fee. Thus, given Plaintiffs' argument that the termination fee here is greatly disproportionate to the loss likely to occur, they should have joined J&J as a party to this suit to make that showing, as J&J is in the best position to explain why the termination fee it seeks is proportionate to its anticipated losses.

Regardless, Plaintiffs are not likely to succeed on the merits of this claim that the Board of Directors breached its fiduciary duty when it agreed to accept a termination fee in the approximate amount of three percent as part of the November 2005 J&J Merger Agreement. As stated earlier, the Business Judgment rule gives the Board broad discretion in structuring its transactions. Further, an independent corporate fiduciary exercising sound business judgment could well have bound the corporation to these provisions in an arm's length bargain to reap the benefits identified above by Fischel. We find no basis on which to conclude that it was not reasonable for the Board to believe, that it was acting in the shareholders' best interest in including the termination fee provision

---

[12] See e.g., Woodbridge Place Apartments v. Washington Square Capital, Inc., 1991 WL 340619, *3 (S.D. Ind., 1991) (J. Brooks) ("[D]efendants failed to make any judgment as to what the losses could possibly be. Three percent (3%) of the loan amount could very well be an industry average of the amount of loss likely to occur on each mortgage loan but without any testimony or evidence to support that fact, three percent (3%) is merely an arbitrary figure which has no proven relation to the loss likely to occur."). See also Czeck v. Van Helsland, 241 N.E.2d 272 (Ind. App. 1968).

in the merger agreement.

### B.     The Indemnification and Insurance Provisions §5.05

The November 2005 J&J Merger Agreement provides that J&J will assume all obligations with respect to indemnifying Guidant's officers and directors from liability, as provided in Guidant's Articles, By-laws, and indemnification contracts.  Id. at Section 5.05(a).  The agreement also provides that J&J will maintain insurance covering Guidant's officers and directors in connection with their Guidant duties for six years following the merger.  Id. at Section 5.05(c).

Plaintiffs argue that but for the merger agreement with J&J, Defendants would not be contractually entitled to "these multi-million dollar [indemnification] benefits that are currently reducing the Merger Price."  Plaintiffs further argue that, absent a sale, Guidant would not have provided these benefits to Defendants.  Bebchuk Decl. at 13.  Further, as a stand-alone entity, Guidant has not offered and is not required to provide six years of ongoing D&O coverage for directors after their directorships terminate; similarly, no bidder should be obligated to provide this coverage.  According to Plaintiffs, Defendants are using their control over this merger to appropriate personal benefits to themselves at the expense of the shareholders.  Pl. Resp. to Ct at 15.

Defendants respond that Plaintiffs are wrongly focused only on maximizing shareholder value and securing the highest merger price.  Indemnification and D&O insurance provisions serve important governance purposes and are routine in merger agreements.  Defendants explain that Guidant's directors and officers are currently

23

entitled to indemnification under Guidant's Articles and bylaws to the extent permitted by Indiana law. IBCL §§ 23-1-37-8(a), 23-1-37-15(a). Defendants represent that they did not "expand the scope of their own indemnification rights" because the indemnification provision merely provides that J&J will assume the obligation "now existing in favor of the current or former directors or officers of the Company as provided by the Company Articles, the Company By-laws or any indemnification Contract between such directors or officers and the Company." Def. Memo in Opp. at 18; citing November 2005 J&J Merger Agreement § 5.05(a). Furthermore, Boston Scientific's offer includes identical indemnification and insurance provisions, which refutes any claim that Guidant's Board would improperly choose one offer over the other based on which one extended to them the personal indemnity and insurance benefits. Finally, Guidant argues, it is customary for a surviving entity to assume the indemnification obligations previously maintained by the acquired company. Sorenson v. Allied Prod. Corp., 706 N.E.2d 1097, 1099 (Ind. Ct. App. 1999).

The IBCL acknowledges that a litigation explosion against directors led to a liability and insurance crisis, which made it difficult for corporations to persuade qualified individuals to serve on boards of directors. Official Comments 23-1-35-1(e). The IBCL authorizes corporations to voluntarily indemnify directors in some situations, even though liability is in fact imposed on the directors. IBCL 23-1-37-8 (-9). Section 23-1-37-14 allows a corporation to buy insurance covering liability arising from an individual's status, whether or not the corporation would have power to indemnify the

individual.

Again, we conclude here that Plaintiffs are not likely to succeed on the merits of their claim that the Board of Directors breached its fiduciary duties when agreeing to include these insurance and indemnity provisions as part of the November 2005 J&J Merger Agreement.  As stated earlier, the Business Judgment Rule gives the Board of Directors broad discretion in structuring the company's transactions and, in any event, directors are allowed to consider other factors besides the amounts paid to shareholders when determining what offer is in the company's best interest.  See §§ 23-1-35-1(f) and 1(g).  Further, an independent corporate fiduciary exercising sound business judgment could have bound the corporation to these provisions in an arm's length bargain because they encourage competent individuals to serve the corporation without fear of personal harm.  We conclude that it was altogether reasonable for the Board to believe that it was acting in the shareholders' best interest in including the indemnification and insurance provisions in the proposed merger agreement.

### C.     The No Talk/No Shop Clause §4.02 or No-Solicitation Provision

In the November 2005 J&J Merger Agreement, Guidant agreed not to (I) solicit, initiate or encourage any takeover proposal for the acquisition of 15 percent of its income, revenues, assets, or equity, or (ii) enter into, continue, or participate in negotiations for such a takeover proposal.  However, this provision did permit Guidant, prior to shareholder approval of the J&J merger, to respond to a *bona fide* written takeover proposal that the Board reasonably determined constituted or was reasonably likely to

25

constitute a superior proposal by furnishing information about Guidant and participating in negotiations regarding the proposal.  Section 4.02(a).

Plaintiffs contend that this clause prohibits Defendants from withdrawing their recommendation in favor of acceptance of the J&J proposal, even if they believe that withdrawing would be in the best interests of Guidant and its shareholders, "until after the fifth business day following Johnson & Johnson's receipt of written notice from Guidant advising Johnson & Johnson that the Guidant board of directors intends to take such action."  Similarly, Defendants must provide the details of Boston Scientific's and others' offers to J&J and "must keep Johnson & Johnson fully informed in all material respects of the status and details, including any changes, of any such takeover proposal."  Id.

Defendants respond that "no solicitation" clauses are common in merger agreements as they lessen the risk to an acquirer that its agreement will be used as a stalking horse for other bids.  Def. Memo in Opp. at 16.  Prof. Fischel reviewed and summarized a sampling of twenty-eight merger agreements for pending and completed mergers with U.S. companies, where the transactions were valued at greater than $10 billion, and announced after January 1, 2003.  Each of the cited transactions in the Fischel exhibit included a no-solicitation clause.

Our review of the case law does not disclose any prior judicial decision concerning the enforceablity of a contract containing a similar No-Shop clause, either under Indiana law or Seventh Circuit opinions.  However, we are persuaded by the analysis found in Hastings-Murtagh v. Texas Air Corp., 649 F. Supp. 479 (S.D. Fla. 1986) (applying

Delaware law), in which case plaintiffs contend that the lock-up and no-shop provisions

were invalid under Delaware law, but upon review the Court disagreed.

> A review of Delaware law shows that such provisions are not void per se.
> Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173
> (Del.1985); Thompson v. Enstar Corp., 509 A.2d 578 (Del. Ch. 1984).
> Rather, such provisions are impermissible only if they are adopted in a
> situation where there is a live auction with competing bidders. Where
> lock-up and no-shop provisions were used to encourage a bidder to submit
> an offer, as distinguished from precluding bidders in an active auction, they
> have been upheld.
> . . . .
> The validity of the lock-up and no-shop provisions is reviewable only in
> light of the circumstances that existed and were known to the directors at
> the time they were adopted. Subsequent events cannot be taken into
> consideration. . . . The lock-up and no-shop provisions did not improperly
> preclude consideration of any [other] bid.

Id. at 484-85 (emphasis added).  We adopt this analysis here, holding that no-talk and

no-shop provisions are valid if they serve to attract a bidder.  See Revlon, Inc. v.

MacAndrews & Forbes Holdings, 506 A.2d 173 (Del. 1985).

The record of the case at bar reflects that the Board of Directors neither used the

no-talk and no-shop provisions to avoid consideration of a pending proposal nor acted in

secrecy to thwart the submission of an opposing bid before the provisions took effect.[13]

Therefore, we conclude that the Directors in this respect acted prudently and in good faith

in accepting those provisions as part of the proposed merger agreement.  Further, an

independent corporate fiduciary exercising sound business judgment could have bound

the corporation to these provisions in an arm's length bargain because, in return for

---

[13] An opposing bid in this case is an actual bid, in writing, that a company can rely on,
not simply a statement that a company would be interested in making a bid.

accepting those terms, the Directors extracted a lock-in provision from J&J, which

mutually obligated J&J to perform under the agreement.  In fact, these terms likely

provided part of the essential consideration for the agreement on the part of J&J but,

because J&J is not a party, we cannot know that with certainty.

## IV.    "Poison Pill" or "Shareholder Rights Plan."

On December 15, 2004, Guidant enacted a shareholder rights plan, which granted

one right for each outstanding share of Guidant common stock to shareholders as of

December 27, 2004.  Plan Section 3(a) (Def. Ex. B).  The plan provided that, in the event

a person becomes an "acquiring person" (i.e., they own more that fifteen percent of

Guidant's outstanding common shares), the holder of each right except for the "acquiring

person" shall have the right to acquire Guidant common stock having the value of two

times the exercise price of the rights.  Plan. Sections, 1, 11.  The plan further provides

that, if there is an announcement that a person has become an "acquiring person,"

Guidant's Board may take action within ten business days thereof to effectively nullify

the plan and the issuance of shares thereunder.  Plan, Section 23.

Plaintiffs allege that, though the Poison Pill is not a provision of the Merger

Agreement as such, it is a defensive measure that clearly was put in place by Defendants

to create "an insurmountable barrier to an acquisition offer not supported by the board."

In re Gaylord Container Corp. S'holders Litig., 753 A.2d 462, 469 (Del. Ch. 2000).  Here,

the Poison Pill was adopted prior to the November 14, 2005 execution of the 2005 J&J

Merger Agreement and thus has no connection to any "corporate action" as that term is

defined by the Dissenters' Rights Statute.  Plaintiffs contend that the Poison Pill is the means by which Defendants have enabled themselves to extract additional benefits from an acquirer - such as the indemnification provisions - that would not be shared equally by the rest of Guidant's shareholders.  Plaintiffs argue that the Poison Pill does not have to be triggered to have its intended, negative effect: "The danger presented by the Poison Pill is that its presence alone allows Defendants to dismiss without negotiation any offers that do not include direct personal benefits for Defendants."  Pl. Resp. to Ct at 16.

Defendants assert that there is no evidence that Guidant's Board has used the shareholder-rights plan improperly to discourage any offers or that the Board intends to do so.  Defendants point to Boston Scientific's rival bid as evidence that the shareholder-rights plan has not had the effect of discouraging competitive bids.  Further, Defendants claim there is no evidence to establish that the Board intends to use the plan to prevent Guidant's shareholders from considering other acquisition proposals.  In fact, they have not yet been faced with making any decision regarding whether to nullify the plan in the face of a party becoming an "acquiring person."

This much is clear concerning the Poison Pill: it is expressly authorized by Indiana law.

> Sec. 5. A corporation, acting through its board of directors, may create or issue rights, options, or warrants for the purchase of shares or other securities of the corporation or any successor in interest of the corporation. The board of directors shall determine the terms upon which the rights, options, or warrants are issued, their form and content, and the consideration for which the shares or other securities are to be issued. The rights, options, or warrants may be issued with or without consideration,

29

and may (but need not) be issued pro rata.

The IBCL also expressly provides that directors are not required to render a shareholder-rights plan inapplicable "solely because of the effect such action might have on a proposed acquisition . . . of the corporation or the amounts that might be paid to shareholders under such an acquisition."  IBCL § 23-1-35-1(f).  See Safety-Kleen Corp. v. Laidlaw Envtl. Servs., No. 97C8003, 1999 WL 601039, *16 (N.D. Ill. Feb. 4, 1998) (recognizing that so-call poison pills serve legitimate shareholder interests).[14]

---

[14]     In addition, the Official Comment to § 23-1-26-5 provides:

> Language was also added expressly authorizing issuance of rights, options and warrants for the purchase of shares or other securities of "any successor in interest of the corporation." This language gives a corporation's board of directors clear statutory authority to adopt, for example, so-called "flip-over pills," under which an acquiring party's acquisition of a certain percentage of shares of the corporation can trigger rights of other shareholders of the corporation to acquire shares or other securities of the acquiring party at specified prices.
>
> The "flip-over pill" is one example of the shareholder rights plans (sometimes called "poison pills") that can be adopted by corporations under this section. The grant of statutory authority does not, of course, mean that every exercise of that authority will necessarily be proper: A board of directors' decisions with respect to a proposed shareholder rights plan, like every other board decision, remain subject to the BCL's standards of conduct for directors, set forth in IC 23-1-35. But such plans can frequently be a legitimate means for protecting minority shareholders in takeover situations, both by granting specific rights to such shareholders and by giving the board of directors

(continued...)

30

As with the other theories on which their claim for injunctive relief is based, Plaintiffs are not likely to succeed on the merits of this claim that the Board breached its fiduciary duty when it enacted the shareholder's rights plan in 2004.  An independent corporate fiduciary exercising sound business judgment could have enacted a poison pill because it gives the Board of Directors powers that they do not necessarily have to use at a given time, if ever, and these types of provisions are specifically permitted under Indiana law.  There is no basis to assume that the Board would invoke the plan to prevent Guidant's shareholders from considering any acquisition proposal and the Board has not been faced with the need to decide whether to nullify the plan in response to a person becoming an "acquiring person."  Therefore, at this juncture, Plaintiffs' claims regarding the poison pill are purely speculative.  In addition, we conclude that it was not unreasonable for the Board to believe that it was acting in the shareholders best interest by giving itself the legal option of invoking a Poison Pill.

## V.       Adequate Remedy at Law

Having concluded that Plaintiffs are unlikely to succeed on the legal merits of their claims, we turn to the issue of whether Plaintiffs have established that they have "no adequate remedy at law."  We conclude that Plaintiffs do have an adequate remedy at

---

[14](...continued)
additional leverage in negotiating, on behalf of the shareholders, with potential acquirers.

Official Comment to IBCL § 23-1-26-5 (emphasis added).

law.  Plaintiffs' other remedies, other than injunctive relief, include the right to vote against the J&J merger and to encourage other shareholders to do the same.  In addition, the claim that shareholders will be damaged by receiving less value in terms of the merger consideration by operation of these challenged provisions is essentially a claim for money damages and money damages almost always constitute an adequate remedy at law; we think they would here as well.  Finally, any harm experienced by dissenting or minority shareholders, such as Plaintiffs, can be ameliorated, if not prevented completely through market options, that is to say, they can sell their stock.

## VI.  Irreparable Harm

Whether Plaintiffs "will suffer irreparable harm if preliminary relief is denied" is an issue also answered in Guidant's favor.  See RWJ Companies, Inc. v. Equilon Enterprises, LLC, 2005 WL 3544295 (S.D. Ind. 2005).  As noted previously, the Plaintiffs' option to ameliorate their harm by transferring or trading their stock on the open market is readily available.  Plaintiffs argue that, by relegating them to the fair market value of their stock in an allegedly corrupt market they in truth have no adequate remedy at all, given that there is no way to reconstruct or remedy the effects of a merger agreement produced by a corrupt process.  The problem, they contend –

> arises when the transaction in question is a merger of a publicly held corporation in which shareholders receive either cash or fixed amount of other securities in return for their shares.  If the directors have wrongfully agreed to an unfairly low price or exchange ration, the option of selling shares on the open market is not really a remedy at all.  The market price should be consistent with the agreed price or value for the merger (probably with a small discount for contingencies before the merger is consummated).

> Thus, [the Wall Street exception] leaves a shareholder wronged by
> directors' approval of a merger without any meaningful remedy at all,
> whether in the courts or in the market.

Shepard I, 137 F. Supp. 2d at 1104.[15]  Similarly, say Plaintiffs, the Indiana Supreme Court

has recognized that the market price of shares does not always reflect their value in the

context of dissenters' rights.  Republic Fin. & Invest. Co. v. Fenstermaker, 211 Ind. 251,

6 N.E. 2d 541 (1937).

   However, the drafters of the IBCL were not persuaded by these arguments that the

market price of shares does not always reflect their value in the context of dissenters'

rights, and therefore the market exception was not only continued, but expanded upon, as

explicated in the Official Comments Section 23-1-44(8)(b).[16]  Accepting this view as

well, we conclude that Plaintiffs will not suffer irreparable harm if they are forced to sell

their shares of stock on the open market.

_____

[15]  Plaintiffs argue that where, as here, the "nature of the plaintiff's loss may make
damages very difficult to calculate," a damage award after the fact will be inadequate so
injunctive relief must issue. Pl. Resp. to Court at 7; citing  Roland Machinery Co. v. Dresser
Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984).

[16]  Official Comment to IC 23-1-44-8 Subsection (b) states:

Subsection (b), which has no RMA counterpart, retains and expands the GCA's
"market exception" to dissenters' rights, found in IC 23-1-5-7(d). The policy
reason for this exception is that the market itself establishes both a fair price for
the shares and a means by which a "dissenting" shareholder can sell his shares for
that price. The Commission found the RMA Official Comments' distrust of
market price unpersuasive, in light of past experience in Indiana. Accordingly, it
recommended that the GCA approach be followed, and that the categories of
recognized markets be expanded to include "the National Association of
Securities Dealers, Inc. Automated Quotations Systems Over-the-Counter
Markets--National Market Issues or a similar market."

## VII.   Balance of Harms

Assuming Plaintiffs were able to show a likelihood of success on the merits, an inadequate remedy at law, and irreparable harm, the court would then be required to balance the harms that would result to Defendants if preliminary relief were erroneously granted against the harms to the Plaintiffs as moving party if the relief is erroneously denied.

We need not reach this issue, however, having resolved all the other factors in Guidant's favor, but if we were to undertake a balancing-the-harms analysis here, it would redound to Guidant's favor.  Guidant, in our clear view, in light of the relative risks of harm, should be permitted to go forward with its merger negotiations and bring matters to a conclusion, if possible, allowing the proposed, negotiated merger agreement to be submitted to the shareholders for their ratification vote.

## VIII.   Public Interest

Finally, in terms of the public interest, including the interests of any persons who are not parties to the case, <u>Abbott Laboratories</u>, 971 F.2d at 11-12, we hold that these merger decisions are best vested in the shareholders, following completion of all the negotiations, which will culminate in a proxy statement on which they are able to make an informed decision.

## <u>Conclusion</u>

For all of these reasons, the Court DENIES Lead Plaintiff's request for preliminary injunctive relief.  In making this decision, we may already have been at least partially

vindicated in view of the fact that after the date of the hearing and issuance of the oral

ruling the Board entered into a proposed merger agreement with Boston Scientific valued

at $80 per share, subject to future action by the Board and shareholders.  IT IS SO

ORDERED.


Date:    02/06/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Joseph D. Ament
MUCH SHELIST FREED DENENBERG AMEND & RUBENSTEIN
200 N. Lasalle St., #2100
Chicago, IL 60601-1095

Randall J. Baron
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
randyb@lerachlaw.com

Richard N. Bell
COHEN AND MALAD
rbell@cohenandmalad.com

Michael S. Bigin
BERNSTEIN LIEBHARD & LIFSHITZ LLP
bigin@bernlieb.com

Mary K. Blasy
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
maryb@lerachlaw.com

James A. L. Buddenbaum
PARR RICHEY OBREMSKEY & MORTON
jbuddenbaum@parrlaw.com

Keith E. Eggleton

WILSON SONSINI GOODRICH & ROSATI
keggleton@wsgr.com

Boris Feldman
WILSON SONSINI GOODRICH & ROSATI
boris.feldman@wsgr.com

Keith M. Fleischman
BERNSTEIN LIEBHARD & LIFSHITZ LLP
fleischman@bernlieb.com

Robert Paul Frutkin
LAW OFFICES OF BERNARD M. GROSS
rpf@bernardmgross.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Carol V. Gilden
MUCH SHELIST FREED et al.
cgilden@muchshelist.com

Bernard M. Gross
1515 Locust Street
2nd Floor
Philadelphia, PA 19102

Deborah Ruth Gross
LAW OFFICE OF BERNARD M. GROSS PC
debbie@bernardmgross.com

James H. Ham III
BAKER & DANIELS
jhham@bakerd.com

Caz Hashemi
WILSON SONSINI GOODRICH & ROSATI
chashemi@wsgr.com

Meredith E. Kotler

36

WILSON SONSINI GOODRICH & ROSATI
mkotler@wsgr.com

Liana A. J. Larson
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
liana@lerachlaw.com

Irwin B. Levin
COHEN & MALAD, P.C.
ilevin@cohenandmalad.com

Sandy A. Liebhard
BERNSTEIN LIEBHARD & LIFSHITZ
10 E 40th Street
New York, NY 10016

Nina F. Locker
WILSON SONSINI GOODRICH & ROSATI
nlocker@wsgr.com

Michael E. Moskovitz
MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive
Suite 1800
Chicago, IL 60606

James M. Orman
1845 Walnut Street
14th Floor
Philadelphia, PA 19103

U. Seth Ottensoser
BERNSTEIN LIEBHARD & LIFSHITZ LLP
ottensoser@bernlieb.com

Anthony W. Patterson
PARR RICHEY OBREMSKEY & MORTON
tpatterson@parrlaw.com

Darren J. Robbins
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP

e_file_sd@lerachlaw.com

Robert M. Roseman
SPECTOR ROSEMAN & KODROFF P.C.
rroseman@srk-law.com

Terry Rose Saunders
SAUNDERS & DOYLE
trsaunders@saundersdoyle.com

John R. Schaibley III
BAKER & DANIELS
jrschaib@bakerd.com

Richard E. Shevitz
COHEN & MALAD, P.C.
rshevitz@cohenandmalad.com

David T. Wissbroecker
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Paul A. Wolfla
BAKER & DANIELS
paul.wolfla@bakerd.com