UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

IN RE GUIDANT CORPORATION          )
SHAREHOLDERS DERIVATIVE            )
LITIGATION                         )
                                   )
                                   )      Master Derivative Docket No.
                                   )      1:03-cv-955-SEB-WTL
THIS DOCUMENT RELATES TO           )
All Derivative Actions             )
                                   )
                                   )

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

This cause is before the Court on Defendants' Motion to Dismiss the Second

Amended Verified Shareholder Derivative Complaint [Docket No. 155], filed on May 1,

2006, brought pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Local

Rule 23.1.  Lead Derivative Plaintiff, Alaska Electrical Pension Fund ("Plaintiff"),

initiated this action on behalf of Guidant Corporation ("Guidant") against Defendants,

James M. Cornelius, Donald W. Dollens, Maurice A. Cox, Nancy-Ann M. DeParle,

Enrique C. Falla, Michael Grobstein, and J.B. King (collectively "Defendants"), all

members of Guidant's Board of Directors during the relevant time period.  Plaintiff brings

claims against all Defendants for breach of fiduciary duties, abuse of control, gross

mismanagement, waste of corporate assets, and against Defendants Cornelius, Dollens,

King, and Lorell for misappropriation of information.

Defendants contend that: (1) Plaintiff no longer has standing to bring this

derivative action on behalf of Guidant because Plaintiff ceased to be a Guidant shareholder following the recent merger between Guidant and Boston Scientific, in which Guidant became a wholly-owned subsidiary of Boston Scientific; (2) in light of the Indiana Supreme Court's "redefin[ition]" of the law of demand futility, Plaintiff has alleged no facts to justify its failure to make demand on the Board; and (3) Guidant shareholders voted to approve the merger with Boston Scientific and that ratification disposes of Plaintiff's claims related to Defendants' alleged breach of their fiduciary duties.

Plaintiff rejoins that: (1) it has standing to sue because Indiana permits shareholder derivative suits to survive mergers when the merger is the subject of a claim of fraud or the shareholder has no other means of redress; (2) demand was futile in this case because the entire Board was interested and ignored "red flags" of misconduct, and therefore, Plaintiff was not required to make demand before filing suit; and (3) it has adequately pled its claims and the business judgment rule provides Defendants no protection under the facts alleged by Plaintiff.  For the reasons detailed in this entry, we <u>GRANT</u> Defendants' Motion to Dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.[1]

---

[1] Because we dismiss Plaintiff's claims for lack of subject matter jurisdiction as a result of our holding that Plaintiff does not have standing to maintain this derivative claim, we need not address Defendants' alternative arguments that the action should be dismissed for failure to make demand and failure to state a claim.

2

## **Factual Background**[2]

### *Guidant's Sale of Defective Devices*

The events that culminated in this litigation began in 1999, soon after Defendants' Ancure Endograft System ("Ancure"), a device designed to treat abdominal aortic aneurysms without traditional open-chest surgical procedures, was approved by the Federal Drug Administration ("FDA") and thereafter began to demonstrate various malfunctions.  Second Am. Compl. ¶ 6.[3]  Defendants did not report these malfunctions publicly until March 2001, when the FDA suspended the sale of Ancure.  Id.  During the time that Ancure was on the market, 2,628 incidents, including twelve deaths, had been reported to Guidant.  Id. ¶ 7.  In October 2000, seven Guidant employees sent an anonymous letter to the FDA and Defendants "describing ethical, legal and safety concerns with the Ancure."  Id. ¶ 9.  In connection with Defendants' failure to disclose the defects, Guidant eventually entered a plea agreement in a criminal case filed against it under which it was required to pay $92.4 million in fines.  Id. ¶ 10.

In February of 2002, in the midst of the fallout from the Ancure problems, Defendants discovered a design defect in the VENTAK PRIZM(R) 2 DR ("VENTAK"), one of the models of implantable defibrillators marketed by Guidant.  Pl.'s Resp. at 4.

---

[2] The facts surrounding this litigation are lengthy and complex, and involve numerous legal contentions.  We have limited our factual recitation to those applicable to Defendants' motion to dismiss.

[3] "Second Am. Compl." refers to the Second Amended Verified Shareholder Derivative Complaint [Docket No. 155].

Defendants began marketing a new defibrillator in April of 2002, but continued to sell the defective version of VENTAK that remained in inventory without disclosing VENTAK's defects to physicians or the public.  Second Am. Compl. ¶ 22.  Additionally, Plaintiff contends that Defendants caused Guidant to issue its 2004 financial results on SEC Form 10-K, including a graph depicting the contributions of the defibrillator products to Guidant's overall revenue, even though they already knew of the problems associated with the use of the defibrillators.  Id. ¶¶ 25-26.  Although approximately 24,000 people had been fitted with the defective model, Defendants chose not to release a letter drafted to alert doctors about the potential defect in the product, even after the March 2005 death of a 21-year-old patient.  Id. ¶¶ 26-27.

According to Plaintiff, Defendants issued an advisory on May 24, 2005, only after learning that The New York Times planned to publish a damaging story about the product.  Id. ¶ 28.  In response to the advisory, the FDA recalled VENTAK and two other models and also issued a Class I warning (its highest) on some of the defibrillators previously recalled.  Id. ¶ 32.  In addition to the problems associated with Ancure and VENTAK, Guidant later disclosed knowledge of a defect in some of its pacemakers, which were recalled on July 18, 2005.  Id. ¶ 34.  On the same day of the pacemaker recall, Guidant's Board Chairman, James M. Cornelius, sold 444,000 shares of Guidant stock, earning him $30.8 million.  Id. ¶ 46.

In September 2005, the FDA inspected Guidant's facilities and discovered deficiencies in Guidant's procedures for conducting quality audits and maintaining its

4

equipment, due, at least in part, to the fact that "management with executive responsibility had not ensured that an adequate and effective quality system had been fully implemented and maintained at all levels of the organization." Pl.'s Resp. at 6. Following this inspection, the FDA sent a warning letter to Guidant on December 22, 2005, advising Guidant that its response to the FDA inspection had been inadequate. On January 5, 2006, another follow-up letter was sent, indicating that a sufficient number of corrections had not yet been made by Guidant, necessitating yet another inspection in mid-2006. Second Am. Compl. ¶ 38.

In addition to the FDA's inspections, Guidant faced inquiries from various law enforcement entities. Guidant announced on October 25, 2005, that it had received subpoenas from offices of the U.S. Department of Justice located in Boston and Minneapolis. Id. ¶ 36. Then New York Attorney General, Eliot Spitzer, announced on November 3, 2005, his filing of a lawsuit against Guidant in relation to the VENTAK defect. Id. ¶ 39. Four days later, on November 7, 2005, Guidant announced that it was under investigation by the SEC regarding certain of Guidant's product disclosures and Guidant stock trades. Id. ¶ 40.


***Merger Negotiations***

Plaintiff reports that the product recalls and the repercussions from those recalls tarnished Guidant's reputation and caused significant financial liability. Second Am. Compl. ¶¶ 13-14, 41. As a result, Plaintiff alleges that Defendants decided to sell Guidant

"to a buyer, on whatever terms that [Guidant] could obtain, so long as the buyer would agree to pay for additional directors' and officers' liability insurance and agree to completely indemnify defendants for all of their misconduct while at the helm of Guidant." Id. ¶ 148.  In pursuit of that goal, Defendants allegedly engaged in merger negotiations between July 2004 and January 2006.  Pl.'s Resp. at 6.  Defendants' negotiations initially were limited to Johnson & Johnson, ("J&J") following which, on December 15, 2004, Guidant publicly announced a merger agreement with J&J valued at approximately $25.4 billion, or $76 per share ("2004 Agreement").  Second Am. Compl. ¶ 155.  On April 27, 2005, Guidant's shareholders approved the 2004 Agreement. Id. ¶ 157.

However, at approximately the same time as the merger agreement was approved by Guidant's shareholders, details of the previously undisclosed problems associated with Guidant's sale of the defective defibrillators and pacemakers publicly came to light, causing J&J's board of directors to become concerned about the 2004 Agreement.  Id. ¶159.  In a November 2, 2005, press release, J&J announced that it did not intend to consummate the merger and that it was repudiating the 2004 Agreement based on the "material adverse effect" clause in the agreement, which J&J maintained had been triggered, thereby releasing J&J from its obligations.  Id. ¶¶ 162-63.  On that same day, Guidant responded with its own press release, laying out its belief that both parties remained legally obligated to complete the transaction in accordance with the 2004 Agreement.  Id. ¶ 164.  Guidant subsequently filed suit against J&J in the Southern

6

District of New York on November 7, 2005, seeking specific performance of the 2004 Agreement. Id. ¶ 167. However, twelve days later, on November 15, 2005, Guidant abandoned its lawsuit and, instead, executed a new merger agreement with J&J valued at $21.5 billion ("2005 Agreement"). Id. ¶¶ 168-69.

On December 5, 2005, Boston Scientific, which had not previously been involved in merger negotiations with Guidant, entered the picture to announce its own bid, valued at $25 billion, to acquire Guidant for $72 per share ("Boston Offer I"). Id. ¶ 166, ¶ 173. This offer by Boston Scientific set off a bidding war between J&J and Boston Scientific. On January 11, 2006, J&J responded to Boston Scientific's bid with an offer of $68 per share, which was a deal worth a total of $23.2 billion ("2006 Agreement"). Id. ¶ 177, ¶ 184. The next day, on January 12, 2006, Boston Scientific revised its offer, whereby it would acquire Guidant for $25.55 billion, which reflected a price of $73 per share ("Boston Offer II"). Id. ¶ 185. In response, on January 13, 2006, Guidant amended its agreement with J&J, with J&J increasing its offer to $24.2 billion ("Revised 2006 Agreement"). Id. ¶ 186. Boston Scientific responded on January 17, 2006, increasing its bid to $27.2 billion, which was computed on the basis of $80 per share ("Boston Offer III") – $4 per share higher than J&J's original bid and $9 per share more than the 2006 Agreement. Id. After this period of back-and-forth bidding, Guidant announced, on January 25, 2006, that it was terminating its agreement with J&J and would consummate a merger with Boston Scientific. Id. ¶ 191. Guidant and Boston Scientific shareholders voted in favor of the merger on March 31, 2006, which transaction closed on April 21,

2006.  Defs.' Mem. at 6.

### *Instant Litigation*

On March 17, 2006, approximately two months after Guidant announced the termination of its agreement with J&J and its plans to merge with Boston Scientific, but before Guidant's shareholders voted in favor of the merger, Plaintiff filed its Second Amended Verified Shareholder Derivative Complaint[4] against all Defendants, which is the subject of the instant action.  Plaintiff contends that, as a result of the "bidding fiasco" involving J&J and Boston Scientific, Defendants caused Guidant to "bargain[] away its good will and damag[e] its marketability through multiple renegotiations, price reductions and unwanted terminations fees."  Second Am. Compl. ¶ 24.  As a result, Plaintiff brings claims against all Defendants for breach of fiduciary duties, abuse of control, gross

---

[4] This cause has a lengthy history in this Court.  On June 26, 2003, the original Complaint was filed, which alleged that Guidant's board of directors breached its fiduciary duties in relation to its handling of the Ancure situation.  On December 17, 2003, the Consolidated Verified Shareholders' Derivative Complaint [Docket No. 43] was filed, which added additional causes of action for abuse of control, gross mismanagement, and waste of corporate assets.  Defendants filed a Motion to Dismiss the Consolidated Complaint [Docket No. 47] on January 23, 2004, for failure to make demand.  On July 13, 2004, we certified a question regarding Indiana's demand requirement to the Indiana Supreme Court.  In the meantime, on December 19, 2004, Plaintiff applied for a temporary restraining order and a preliminary injunction [Docket No. 80] in an attempt to restrain Defendants from taking action pursuant to various provisions (the Penalty Clause, the No-Talk/No-Shop Clause and Indemnification/D&O insurance provision, and the Poison Pill) included in the 2004 and 2005 Agreements with J&J. In our February 6, 2006, entry [Docket No. 132], we denied Plaintiff's application for injunctive relief.  Plaintiff amended the Consolidated Complaint twice more to incorporate facts surrounding the continuing merger developments that have taken place, which has brought us to where we are today.

8

mismanagement, waste of corporate assets, and additional claims against Defendants Cornelius, Dollens, J.B. King, and Lorell for misappropriation of information.

## Legal Analysis

### I.    *Standard of Review*

#### A.    *Federal Rule of Civil Procedure 12(b)(1)*

Defendants' motion challenging Plaintiff's standing is, in effect, a challenge to the court's jurisdiction properly raised under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  When ruling on such a motion, "a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." St. John's United Church of Christ v. City of Chicago, 502 F.3d 616, 625 (7th Cir. 2007) (quoting Long v. Shorebank Dev. Corp., 182 F.3d 548, 554 (7th Cir. 1999)).  Dismissal is proper only if the plaintiff cannot establish any set of facts that would legally entitle him or her to the relief sought.  Baker v. Indiana Family & Soc. Servs. Admin., 260 F. Supp. 2d 731, 734 (S.D. Ind. 2003) (Barker, J.).

The party "'asserting federal jurisdiction' must 'carry the burden of establishing [its] standing under Article III.'" Hinrichs v. Speaker of House of Representatives of the Indiana General Assembly, 506 F.3d 584, 590 (7th Cir. 2007) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006)).  The elements of standing are "'not mere pleading requirements but rather an indispensable part of the plaintiff's case' and 'each element must be supported in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" MainStreet Organization of Realtors v. Calumet City, Illinois, 505 F.3d 742, 752 (7th Cir. 2007) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### B.   *Federal Rule of Civil Procedure 9(b)*

In connection with their standing argument, Defendants claim that Plaintiff has failed to comply with Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."  In general, the statement of a claim need only be sufficient to give the opposing party notice of the claim.  See Fed. R. Civ. P. 8; Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512-13 (2002).  However, Rule 9(b) mandates a heightened pleading requirement for averments of fraud, in "response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do."  Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007) (internal quotation marks omitted).

Therefore, a plaintiff "'claiming fraud . . . must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate.'" Id. (quoting Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)).  Thus, "[a] complaint alleging fraud must provide 'the who, what, when, where, and how.'" Id. (quoting U.S. ex rel. Gross v. AIDS Research Alliance-Chicago, 415 F.3d 601, 605 (7th Cir. 2005)).  These requirements of

10

particularity compel a plaintiff to state "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1327 (7th Cir. 1994) (internal quotation marks omitted).

## II.   *Standing*

Indiana law requires that in a shareholder derivative action a derivative plaintiff be "a shareholder of the corporation when the transaction complained of occurred or . . . [become] a shareholder through transfer by operation of law from one who was a shareholder at that time." IND. CODE 23-1-32-1.  Additionally, the derivative plaintiff must remain a shareholder throughout the pendency of the litigation to ensure that the person commencing the proceeding fairly and adequately represents the interests of the shareholders in enforcing the right of the corporation.  See id. ("The derivative proceeding may not be maintained if it appears that the person commencing the proceeding does not fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation."); Gabhart v. Gabhart, 370 N.E.2d 345, 389 (Ind. 1977) ("[T]he requirement of shareholder status to commence and maintain an action on behalf of a corporation insures that the party bringing suit will have, at least, an indirect interest in the outcome of the litigation.").

Consequently, a shareholder may lose standing to maintain a derivative suit following a merger, if, after the merger, the shareholder of the merged corporation is not

11

also a shareholder of the surviving corporation.  "[S]hareholders in a merged corporation [are] generally prohibited from litigating a derivative suit based on the misdeeds of officers and directors of the merged corporation where those shareholders ha[ve] no interest in the surviving corporation."  U.S. Fidelity and Guaranty Co. v. Griffin, 541 N.E.2d 553, 555 (Ind. Ct. App. 1989) (citing Gabhart, 370 N.E. 2d at 357).  Thus, such a shareholder's "interest in the merged corporation's cause of action is in the same category as his interest in the other assets of the merged corporation, and the cause of action generally affects only the value of the shareholder's stock for appraisal purposes."  Gabhart, 370 N.E. 2d at 357.

When a corporation merges, all of the merged corporation's assets and liabilities, including causes of action it may have had, are transferred to the surviving corporation.  Griffin, 541 N.E.2d at 555 (citing Gabhart, 370 N.E. 2d at 357); Knightstown Lake Property Owner's Ass'n, Inc. v. Big Blue River Conservancy Dist., 383 N.E.2d 361, 366 (Ind. Ct. App. 1978).  Therefore, in such a situation, the right to bring the action generally passes to the surviving corporation, which can choose to maintain a derivative suit if it so desires.  Although the surviving corporation is generally entitled to maintain the derivative suit, "if none of the shareholders in the surviving corporation would be entitled to bring a derivative action to enforce the merged corporation's cause of action, because each had participated in the wrong complained of, the surviving corporation itself is not entitled to bring the action."  Gabhart, 370 N.E. 2d at 357.

Thus, in Gabhart v. Gabhart, the Indiana Supreme Court noted particular concern

regarding situations in which directors of a corporation might seek out a merger in order to insulate themselves from liability.  Id.  In such cases, the court in Gabhart suggested that, under principles of equity, a former shareholder may still be able to bring a derivative suit if the former shareholder's "equity was adversely affected by the fraudulent act of an officer or director and whose means of redress otherwise would be cut off by the merger, if there is no shareholder of the surviving corporation eligible to maintain a derivative action for such wrong and said shareholder had no prior opportunity for redress by derivative action against either the merged or the surviving corporation."  370 N.E.2d at 358.

The Indiana Court of Appeals has narrowly interpreted Gabhart, observing that, "in preserving conditions under which equitable considerations require courts to abandon the general rule that after a merger takes place, former shareholders lose standing to maintain a derivative action on behalf of the merged corporation, the Supreme Court of Indiana was attempting to create an exception *where the merger itself is subject to a claim of fraud*."  U.S. Fidelity and Guaranty Co. v. Griffin, 541 N.E.2d 553, 556 n.4 (Ind. Ct. App. 1989) (emphasis added); accord Shepard v. Meridian Ins. Group, Inc., 137 F. Supp. 2d 1096, 1109 (S.D. Ind. 2001) (Hamilton, J.) ("The Gabhart exception was addressed to possible fraud in a merger.").  Thus, if a merger is effected "solely for the purpose of shielding wrongdoers from liability" and is "devoid of a legitimate corporate purpose," Gabhart, 370 N.E.2d at 357, a former shareholder may still have derivative standing even

13

after losing shareholder status.[5]

 Plaintiff contends that the equitable exception noted in Gabhart is applicable here because Plaintiff has alleged, with particularity, "that defendants sought out a merger, first with Johnson & Johnson, and then with Boston Scientific, for the sole purpose of obtaining indemnification for their past misconduct and extinguishing their liability in derivative suits."  Pl.'s Resp. at 22.  We disagree.  As an initial matter, as Judge Hamilton noted in Shepard v. Meridian Insurance Group, Inc., "the suggested 'equitable exception'

---

 [5] Plaintiff contends that in Griffin, the Indiana Court of Appeals misread Gabhart by concluding that the Indiana Supreme Court was addressing only those circumstances in which the merger itself is the subject of a claim of fraud.  Instead, Plaintiff argues that Gabhart recognized two exceptions – the fraudulent merger exception and an additional equitable exception that applies when the merger is otherwise legitimate.  Plaintiff contends that, in the case of a valid merger, "a derivative lawsuit may be maintained by a former shareholder to 'redress' wrongs that would 'otherwise be cut-off by the merger, if there is no shareholder of the surviving corporation eligible to maintain a derivative action for such wrong.'"  Pl.'s Resp. at 20-21 (quoting Gabhart, 370 N.E.2d at 358).  In support of this contention, Plaintiff cites Fleming v. Int'l Pizza Supply Corp., 676 N.E.2d 1051 (Ind. 1997), Young v. Gen. Acceptance Corp., 738 N.E.2d 1079 (Ind. Ct. App. 2000), and Settles v. Leslie, 701 N.E.2d 849 (Ind. Ct. App. 1998).  However, while these opinions briefly note that, if a derivative suit is filed before consummation of a merger, it is possible that the action could go forward, none of these cases explicitly considered, much less held, that a plaintiff who loses his or her status as a shareholder on account of a valid merger retains standing to maintain the derivative action.  In any event, the court in Gabhart made clear that it was addressing a situation in which, although the cause of action had passed to the surviving corporation as a result of the merger, the surviving corporation itself was not entitled to bring the action because "none of the shareholders in the surviving corporation [were] entitled to bring a derivative action to enforce the merged corporation's cause of action, *because each had participated in the wrong complained of*."  370 N.E.2d at 357 (emphasis added).  Here, Plaintiff has made no allegations of wrongdoing on the part of any Boston Scientific shareholders.  Thus, any right to proceed against Defendants has passed to Boston Scientific.  See, e.g., In re Mercury Interactive Corp. Derivative Litigation, 487 F. Supp. 2d 1132, 1137 (N.D. Cal. 2007) (holding that, in the absence of wrongful conduct by the surviving corporation, "the Court would have no basis, as a matter of equity, for interfering with [surviving corporation's] decision as to whether to prosecute a derivative action against [defendants]").

14

from Gabhart appears not to have been applied by any reported Indiana decision . . . ." 137 F. Supp. 2d at 1109. We too have been unable to find any Indiana decision that has applied the exception, or, for that matter, one that has fully developed its parameters beyond those described in Gabhart. However, certain jurisdictions outside of Indiana have recognized a similar exception where the merger, itself, is the subject of a claim of fraud, and have thus fleshed out such an exception. See, e.g., Lewis v. Ward, 852 A.2d 896, 904-905 (Del. 2004) (citing Lewis v. Anderson, 477 A.2d 1040 (Del. 1994)). We have examined these decisions to aid our analysis here.

A derivative complaint seeking to invoke the fraud exception "must demonstrate that the merger was fraudulent and done merely to eliminate derivative claims." Lewis, 852 A.2d at 905. Additionally, recent cases have held that to invoke the fraud exception, "the plaintiff must plead fraud not only on the part of the acquired corporation, *but also on the part of the surviving entity*." Kolancian v. Snowden, ___ F. Supp. 2d ___, 2008 WL 219759, at *2 (D. Mass. January 25, 2008) (citing In re Mercury Interactive Corp., 487 F. Supp. 2d 1132, 1137 (N.D. Cal. 2007) ("[T]he limited instances in which the [fraud] exception have been applied indicate that the *surviving* corporation must participate in the fraud in order for the merger exception to apply."). The particularized pleading requirement of Rule 9(b) applies; therefore, in order to avoid dismissal, the plaintiff is required to plead particularized facts invoking the fraud exception. Lewis, 852 A.2d at 905. Here, Plaintiff has failed to allege any wrongdoing on the part of the surviving corporation, Boston Scientific, a failure which, in its own right, courts have

15

noted is a sufficient ground to warrant dismissal.  Kolancian v. Snowden, 2008 WL 219579, at *2.

However, even if we were to look past that deficiency, the allegations that Plaintiff has made regarding the merger between Guidant and Boston Scientific do not support Plaintiff's contention that the purpose of the merger was to frustrate the derivative action. As an initial matter, the exact scope of Plaintiff's attack on the merger is unclear, as Plaintiff seems at least partially to have abandoned this argument in its later briefing, stating that, "Plaintiff has made clear that it is not asserting any claims based on the merger, relating to the fairness of the price paid or to fairness of the negotiation process."[6] Pl.'s Resp. at 23.  This seems to contradict Plaintiff's claim that it has alleged with particularity that the sole purpose of Guidant's merger with Boston Scientific was to insulate Defendants from personal liability.

Even putting that aside, although Plaintiff has alleged that there were nefarious motives behind Defendants' decision to enter into initial merger negotiations with J&J,[7]

---

[6] Plaintiff states that the only claim related to Guidant's merger with Boston Scientific that it continues to allege is a waste claim related to the termination fee that Guidant was forced to pay to J&J as a result of its accepting Boston Scientific's final offer.  Pl.'s Resp. at 23.

[7] For example, Plaintiff claims that the 2004 Agreement with J&J "was designed to obtain a comprehensive indemnification and insurance clause from one of the world's largest and most stable health care companies, which defendants believed would shield them from personal liability for their misdeeds at Guidant."  Second Am. Compl. ¶ 154.  Once information regarding the previously undisclosed problems with the defective products that Guidant sold began to surface in 2005, J&J repudiated the 2004 Agreement and Boston Scientific began to express an interest in acquiring Guidant.  At that point, Plaintiff alleges that Guidant chose to sue J&J, seeking specific performance of the 2004 Agreement, "[r]ather than enter into negotiations [with

(continued...)

all indications are that the merger eventually consummated with Boston Scientific, which is the merger at issue here, was undertaken for legitimate corporate purposes.  Plaintiff's allegations that Defendants sought a merger in order to shield themselves from liability are made only with reference to Defendants' drawn-out negotiations with J&J; Plaintiff makes no similar allegations with regard to Guidant's negotiations with Boston Scientific. In fact, the only claim that Plaintiff advances with regard to the merger negotiations with Boston Scientific is that, by continually rebuffing Boston Scientific's proposed offers in favor of J&J's, Defendants "were willing, all in a quest for safe harbor, to allow the price Guidant's shareholders received for their stock to be discounted by *billions of dollars* in order to allow themselves to retain the comprehensive and well-sought after 'benefits package' of indemnity and liability insurance provided by J&J."  Second Am. Compl. ¶ 195.  However, Defendants finally abandoned merger negotiations with J&J and accepted Boston Scientific's last offer, worth $27.2 billion and priced at $80 per share – $4 per share more than J&J's original offer in 2004, and $9 per share more than J&J's then-

---

[7](...continued)
Boston Scientific] that might put their indemnity agreement [with J&J] at risk."  Id. ¶ 167.  After withdrawing their lawsuit against J&J, Plaintiff contends that Defendants reopened negotiations with J&J, but continued to insist that their amended agreement, the 2005 Agreement, contain liability coverage and indemnification for personal liability in order to "maintain[] an escape vehicle for any potential liability."  Id. ¶ 172.  None of these statements in any way implicates, or even addresses, the validity of Guidant's eventual merger with Boston Scientific.  Furthermore, Plaintiff's allegations are largely based on Defendants' insistence on the inclusion of indemnity and insurance provisions in Guidant's merger agreements with J&J, the inclusion of which was previously challenged in this court as a breach of fiduciary duties but found to be unavailing.  In denying the request for injunctive relief in our February 6, 2006, we noted legitimate reasons for including such provisions in merger agreements.

current proposal.  According to Plaintiff, at that point, Defendants "*finally* caused Guidant to declare [Boston Scientific's offer] . . . to be the superior proposal because defendants "knew that it [was then] apparent that there was no viable justification for continuing to push for a merger with J&J."  Id. ¶ 188.

Although Plaintiff's allegations clearly implicate only the negotiations between Guidant and J&J, Plaintiff now attempts to paint the Boston Scientific merger with the same broad brush.  This is a fruitless undertaking.  Plaintiff's own Complaint serves only to bolster the validity of the Boston Scientific merger, continually referring to Boston Scientific's offer as "the superior proposal," id. ¶ 177, and "this far superior offer."  Id. ¶ 186.  In short, Plaintiff has failed to allege any particularized facts attacking the Boston Scientific merger as fraudulent and "devoid of a legitimate corporate purpose."  Gabhart, 370 N.E.2d at 357.  Thus, there is no justification for applying the fraud exception to the general derivative standing rule here.  Therefore, having lost shareholder status upon Guidant's merger with Boston Scientific, Plaintiff lacks standing to maintain the present derivative action.  For the reasons detailed above, we GRANT Defendants' Motion to Dismiss.

### III.   Conclusion

We hold that, as a result of the merger between Guidant and Boston Scientific, which eliminated Plaintiff's shareholder status, Plaintiff no longer has standing to maintain this derivative lawsuit.  Thus, we GRANT Defendants' Motion to Dismiss,

pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.


Date: _____03/27/2008_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:
Joseph Daniel Ament
MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN PC
jament@muchshelist.com

Randall J. Baron
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
randyb@lerachlaw.com

Richard N. Bell
COHEN AND MALAD
rbell@cohenandmalad.com

Michael S. Bigin
BERNSTEIN LIEBHARD & LIFSHITZ LLP
bigin@bernlieb.com

Mary K. Blasy
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
maryb@lerachlaw.com

James A.L. Buddenbaum
PARR RICHEY OBREMSKEY & MORTON- Lebanon
jbuddenbaum@parrlaw.com

Keith E. Eggleton
WILSON SONSINI GOODRICH & ROSATI
keggleton@wsgr.com

Boris  Feldman
WILSON SONSINI GOODRICH & ROSATI
boris.feldman@wsgr.com

Keith M. Fleischman
BERNSTEIN LIEBHARD & LIFSHITZ LLP
fleischman@bernlieb.com

Cheryl W. Foung
WILSON SONSINI GOODRICH & ROSATI
cfoung@wsgr.com

Robert Paul Frutkin
LAW OFFICES OF BERNARD M. GROSS
rpf@bernardmgross.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Carol V. Gilden
MUCH SHELIST
jament@muchshelist.com

Bernard M. Gross
1515 Locust Street
2nd Floor
Philadelphia, PA 19102

Deborah Ruth Gross
LAW OFFICE OF BERNARD M. GROSS PC
debbie@bernardmgross.com

James H. Ham III
BAKER & DANIELS
jhham@bakerd.com

Caz  Hashemi
WILSON SONSINI GOODRICH & ROSATI
chashemi@wsgr.com

Meredith E. Kotler
WILSON SONSINI GOODRICH & ROSATI
mkotler@wsgr.com

Liana A. J. Larson
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
e_file_sd@lerachlaw.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Sandy A. Liebhard
BERNSTEIN LIEBHARD & LIFSHITZ
10 E 40th Street
New York, NY 10016

Nina F. Locker
WILSON SONSINI GOODRICH & ROSATI
nlocker@wsgr.com

Michael E. Moskovitz
MUCH SHELIST FREED DENENBERG AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive
Suite 1800
Chicago, IL 60606

Udoka  Nwanna
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
udokan@lerachlaw.com

James M. Orman
1845 Walnut Street
14th Floor
Philadelphia, PA 19103

U. Seth Ottensoser
BERNSTEIN LIEBHARD & LIFSHITZ LLP
ottensoser@bernlieb.com

Anthony W. Patterson
PARR RICHEY OBREMSKEY & MORTON
tpatterson@parrlaw.com

Darren J. Robbins

COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
e_file_sd@csgrr.com

Robert M. Roseman
SPECTOR ROSEMAN & KODROFF P.C.
rroseman@srk-law.com

Terry Rose Saunders
SAUNDERS & DOYLE
trsaunders@saundersdoyle.com

John R. Schaibley III
BAKER & DANIELS
jrschaib@bakerd.com

Richard E. Shevitz
COHEN & MALAD, P.C.
rshevitz@cohenandmalad.com

David T. Wissbroecker
COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
dwissbroecker@csgrr.com

Paul A. Wolfla
BAKER & DANIELS
paul.wolfla@bakerd.com